UNITED STATES of America, Plaintiff,

v.

**CERTAIN ACCOUNTS, TOGETHER WITH ALL MONIES ON DEPOSIT THEREIN, et al., Defendants.**

**No. 91–1018–CIV.**

United States District Court,
S.D. Florida.

Feb. 21, 1992.

Kathy Stark, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Brian S. Keif, Guy R. Strafer, Ana Barnett, Henry Bolz, Alan Fine, Donald Bierman, Barry D. Hunter, George Volsky, Stephen Gillman, Jose A. Casal, Miami, Fla., Jack Blumefeld, Coral Gables, Fla., for defendants.

## OMNIBUS ORDER ON CLAIMANTS' MOTIONS TO DISMISS

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court on several Claimants' Motions to Dismiss the government's Verified Complaint. The Court, having reviewed the motions, memoranda, and affidavits submitted in support of and in opposition to Claimants' motions, and having heard the oral argument of counsel, rules as follows:

### I. ALLEGATIONS OF THE VERIFIED COMPLAINT

By this action, the government seeks to forfeit all monies on deposit in thirty-one bank accounts as funds involved in or traceable to money laundering, pursuant to 18 U.S.C.A. § 981 (Supp.1991). The suit stems from the arrest of an individual named Zapata, who "attempted to assault" a U.S. Customs Special Agent with a machine gun. Compl. at ¶ 5. Zapata apparently was a "smurf," meaning that he would go from bank to bank and conduct multiple cash transactions in amounts just below the reporting threshold of 31 U.S.C.

§ 5322.[1] At the time of his arrest, Zapata possessed receipts for approximately one million dollars in money orders, and two overnight letter invoices allegedly used to ship the money orders for deposit into various bank accounts. He also possessed a handwritten list of bank accounts into which he had deposited "a substantial sum" of money orders. *Id.* The Complaint does not allege that the cash itself was proceeds of any illegal activity, such as narcotics trafficking. The Complaint does not state that Zapata was convicted of any money laundering offense.

The Complaint alleges that "some of the money orders" for which Zapata had receipts at the time of his arrest were subsequently deposited into accounts in New York and Florida. *Id.* Several of the banking institutions in New York who sold money orders to Zapata have indicated that these money orders were subsequently deposited into certain accounts in Florida. *Id.* The accounts that received money order deposits hereinafter will be referred to as "direct recipient accounts."[2] The government seeks to forfeit the entire balance of the Florida direct recipient accounts as currency or proceeds traceable thereto utilized in a financial transaction which was designed to evade federal reporting requirements.[3] The Complaint separately identifies these four defendant accounts by bank, account number, and owner. *Id.* at ¶ 11 (I–IV).[4] As to each of these accounts, the government alleges that money orders purchased in New York on or about March 5, 1991 were shipped via overnight carrier to Miami, and negotiated into the direct recipient accounts on or about March 15, 1991. *Id.*

The government also seeks forfeiture of some twenty-seven Florida indirect recipient accounts.[5] The Complaint alleges that checks drawn on New York direct accounts were negotiated into each of the arrested indirect accounts. There exists a wide disparity between indirect accounts as to the amount and frequency of these suspect transactions. For example, an account containing $159,277.66 maintained in the name of "Cutlery Foundation" received sixteen deposits from seven direct accounts, totalling in excess of $62,000.00; in contrast, an account containing $49,037.78 maintained in the name of Arie Eidelman received a single check for $1,500.00. Most of the remaining accounts fall between these two extremes, having received several checks drawn on New York direct accounts. The indirect accounts were identified by U.S. Customs Agents and other law enforcement personnel, who reviewed bank records prepared by "forensic accountants." Compl. at ¶ 12. The Complaint alleges that checks written against the direct accounts were signed by the accountholder in blank, and then transported to unknown individuals in Medellin, Colombia and Caracas, Venezuela. *Id.* at ¶ 10. Certain checks were subsequently made out to various indirect accountholder payees, and then deposited into the Florida accounts at issue. *Id.*

## II. ANALYSIS

To date, nine Claimants have filed motions to dismiss.[6] Each of the motions

---

1. *See generally* Welling, *Smurfs, Money Laundering, and the Federal Criminal Law: the Crime of Structuring Transactions,* 41 Fla.L.Rev. 287 (1989).

2. The Verified Complaint refers to these accounts as "primary accounts."

3. A forfeiture action against the New York direct accounts has been filed in the United States District Court for the Eastern District of New York, case number CV–91–0881, March 13, 1991.

4. The four Florida direct accounts are maintained in the name of the following claimants:

Elnore Resources, Benwood Trading Company, Recreaciones La Vega, C.A., and Brickell Bay International Services.

5. The Verified Complaint refers to these accounts as "secondary accounts." The indirect accounts are identified by Claimant, bank, and account number in paragraph 12(a—aa) of the Complaint.

6. Motions to Dismiss have been filed by the following Claimants: Armor Financial, Cecilia Patricia Luna, Max Rausch and Lucy Restrepo de Rausch, Guillermo Arenas, Luis Carlos Alvarado Mazo, Hernando Macias Gutierrez, Federico Molina, Recreaciones, and Elnore Resources.

challenges the sufficiency of the Complaint under the Supplemental Rules of Certain Admiralty and Maritime Claims ("Supplemental Rules"). The gravamen of Claimants' arguments is that the Verified Complaint fails to satisfy the heightened pleading requirements established by the Supplemental Rules. This claim is much more than a quibble over a technical defect in the pleadings cured easily by later amendment. The filing of a Complaint in a civil forfeiture action has far-reaching consequences for those who claim ownership of defendant property. The property in the usual case is immediately seized and held pending resolution on the merits, solely on the basis of the Complaint's allegations. Moreover, the filing of the Complaint also necessarily exposes any potential claimant to the extensive discovery allowed by the Federal Rules of Civil Procedure. The importance of this stage of forfeiture litigation demands a thorough review of the complaint by the district court.

### A. PLEADING REQUIREMENTS UNDER THE SUPPLEMENTAL RULES

■ The government has brought this action under the Supplemental Rules. In civil forfeiture actions, the Federal Rules of Civil Procedure apply, "except to the extent that they are inconsistent with these Supplemental Rules." Fed.R.Civ.P.Supp. A. Therefore, the government must comply with the more stringent pleading requirements of Supplemental Rule E(2), rather than the liberal provisions of Fed. R.Civ.P. 8. *See United States v. Real Property on Lake Forest Circle*, 870 F.2d 586, 588 n. 3 (11th Cir.1989). Supplemental Rule E(2) provides:

[T]he complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence

an investigation of the facts and to frame a responsive pleading.

The particularity requirement is imposed because of the drastic nature of forfeiture actions. *See* 12 C. Wright & A. Miller, *Federal Practice and Procedure*, § 3242 (1973). The government may not seize and continue to hold property upon conclusory allegations that the defendant property is forfeitable. *See United States v. $38,-000.00 in United States Currency*, 816 F.2d 1538, 1548 (11th Cir.1987) (hereinafter "*$38,000.00*"). The language and intent of the Supplemental Rules compel an exposition of those facts known to the government that support its claim that property is subject to forfeiture.

### B. BURDENS AT TRIAL AND MONEY LAUNDERING FORFEITURE

In evaluating the factual sufficiency of a forfeiture complaint under Rule E(2), the Court must focus upon (1) the government's initial burden at trial, which inquiry in turn depends upon (2) the statutory forfeiture scheme.

■ First, in forfeiture actions, the government need not establish at trial that property is subject to forfeiture by a preponderance of the evidence; it may meet its burden by showing that probable cause exists to believe the property is subject to forfeiture. *See United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties*, 941 F 2d 1428, 1438–39 (11th Cir.1991) (reh'g *en banc*) (hereinafter "*Four Parcels*")[7]. The burden then shifts to the claimant to show by a preponderance of the evidence that the property is not forfeit. *Id.* at 1438. On the basis of the government's initial burden, the Eleventh Circuit has interpreted Rule E(2) to require that a "forfeiture complaint must allege sufficient facts to provide a reasonable belief that the property is subject to

---

7. *Four Parcels* was decided under 21 U.S.C. § 881, the narcotics trafficking forfeiture statute. As discussed *infra*, the government brings this action under the Money Laundering Control Act of 1986, 18 U.S.C. § 981. The statutes incorporate by reference 19 U.S.C. § 1615, which governs the burdens of proof for forfeiture under the customs laws. *See* 21 U.S.C.

§ 881(d) and 18 U.S.C. § 981(d). Section 1615 provides in relevant part: "In all suits or actions ... where the property is claimed by any persons, the burden of proof shall lie upon such claimant; ... *provided*, That probable cause shall first be shown for institution of such suit to be judged by the court...."

forfeiture: in particular, that the government has probable cause to believe that a substantial connection exists between the property to be forfeited and [the underlying criminal activity]." *Id.* at 1442 n. 28 (quoting *$38,000.00,* 816 F.2d at 1548). Probable cause in this context is defined as "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Four Million, Two Hundred Fifty–Five Thousand,* 762 F.2d 895, 903 (11th Cir. 1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986).

The second step in this inquiry requires an analysis of the government's theory of forfeiture. The precise question is whether, *under the relevant forfeiture statute,* the complaint alleges sufficient facts to give rise to a reasonable belief that the government can establish probable cause at trial.

In many civil forfeiture actions in this district, this inquiry is not complex. Property involved in narcotics trafficking, for example, is subject to forfeiture if it facilitates such illegal activity, or constitutes proceeds traceable to the exchange of controlled substances. *See* 21 U.S.C. § 881(a)(6) & (a)(7). Under § 881, the requisite "substantial connection" is usually plain. The government need only allege facts that support a reasonable belief that the property was used in the drug transaction, or purchased with funds derived therefrom.

In this instant case, however, the government seeks forfeiture under the Money Laundering Control Act of 1986, 18 U.S.C. § 981. The Act provides in relevant part:

[T]he following property is subject to forfeiture to the United States:

(A) Any property, real or personal, *involved in* a transaction or attempted transaction in violation of section 5313(a) or 5324 of title 31 or of section 1956 or 1957 of this title, or any property *traceable* to such property.

18 U.S.C. § 981(a)(1)(A) (emphasis added). It is clear from the text that the government must allege a violation of one of the referenced statutes.[8] The type of necessary "substantial connection" between the illegal activity and the property to be forfeited is less clear. In the paradigmatic case, those funds directly involved in a "structured" transaction carried out by a convicted "smurf" certainly would be subject to forfeiture under this statute. There is no doubt that the money order purchased for $9,999.00 in cash by a convicted "smurf" is forfeit to the government. The pleading requirements in a case against these funds are obvious.

The difficulty comes where, as here, the government seeks forfeiture of funds in an account into which tainted funds have been negotiated, *without stating any facts concerning the balance of the account.* There exists a real possibility that unknowing and factually innocent accountholders who have received an allegedly tainted deposit may be deprived of the use of the funds until such time as they can assert the innocent owner defense contained in 18 U.S.C. § 981(a)(2). In keeping with the civil forfeiture fiction that the suit is against the property *qua* property—and not the claimant—the action may proceed for months or perhaps years with no showing that the accountholder had any knowledge of the money laundering. Therefore, the district court has an obligation to scrutinize at the outset the government's complaint against the funds at issue. Indeed, the Supplemental Rules demand no less.

## C. RELEVANT CASELAW UNDER 18 U.S.C. § 981

There exists a relative paucity of decisional law on the precise question before the Court.[9] Research has disclosed only

---

**8.** The referenced sections contain substantive money laundering prohibitions. 31 U.S.C. § 5313 imposes reporting requirements on financial institutions; 31 U.S.C. § 5324 prohibits the "structuring" of transactions to evade reporting requirements; 18 U.S.C. § 1956 prohibits certain forms of money laundering and provides criminal penalties; 18 U.S.C. 1957 prohibits engaging in monetary transactions in property derived from specified unlawful activity.

**9.** By contrast, there is a wealth of caselaw construing the forfeiture statute for narcotics trafficking, 21 U.S.C. § 881. While cases under that

two courts that have allowed suits brought under § 981 to proceed against *all* of the funds in accounts receiving tainted deposits.

The case of *United States v. All Monies ($477,048.62) in Account No. 90-3617-3*, 754 F.Supp. 1467 (D.Haw.1991) (hereinafter "*$477,048*") was one of some twenty-six civil forfeiture cases in the District of Hawaii arising from a criminal investigation of a large money laundering ring. The claimant in *$477,048*, Henry Lelouch, owned a money exchange in Peru allegedly used by certain indicted or convicted money launderers. Lelouch also owned the defendant property involved in the case, funds in a bank account in Florida. Importantly, Lelouch conceded that the government had established probable cause as to more than $240,000 of the account under § 981(a)(1). It was thus established that the account had been used for money laundering; the issue on summary judgment was whether probable cause existed to forfeit the potentially legitimate remainder of the account. The court held that the entire balance was forfeit to the government.

The court in that case first noted that § 981 does not expressly provide for a "facilitation" theory of forfeiture. *Id.* at 1472. Relying on a sentence in the legislative history of the statute,[10] the court construed the term "property ... involved in" illegal money laundering transactions to imply a facilitation theory in the statute. *Id.* at 1473. While the legislative history cited may not be dispositive, the court's subsequent analysis is compelling. The account, the court recognized, provided "a repository for the drug proceeds in which the legitimate money could provide a 'cover' for those proceeds thus making it more difficult to trace the proceeds." *Id.* at 1475–76. Thus, since "facilitation" has been defined in the forfeiture context as making the underlying criminal activity less difficult or "more or less free from obstruction or hindrance," *United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir.1990), the legitimate funds "facilitated" the crime of money laundering.

The Eastern District of New York recently reached the same conclusion in *United States v. Certain Funds on Deposit in Account No. 01-0-71417*, 769 F.Supp. 80 (E.D.N.Y.1991) ("*Certain Funds on Deposit*"). In that case, certain claimants were alleged to have fraudulently disbursed to themselves funds from a federally insured credit union controlled by these claimants, and then to have cleared these amounts through accounts they owned in other banks. The Court ruled that the whole balance of the accounts was subject to for-

statute are analogous to the instant matter in many respects, they do not resolve the issue in this case. Because § 881(a)(7) expressly provides for forfeiture based on a "facilitation" theory, and by its terms allows forfeiture of entire parcels of land used in part in drug related activity, it is easier to state a claim against the *whole* of property allegedly involved in a drug transaction. *See, e.g., United States v. Real Property and Residence at 3097 S.W. 111th Avenue*, 921 F.2d 1551 (11th Cir.1991) (where drug transaction occurred in driveway, complaint that so alleged held sufficient under § 881(a)(7) to subject entire dwelling to forfeiture).

**10.** The legislative history relied upon in *$477,048* states:

[T]he term "property involved" is intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and *any property used to facilitate the laundering offense.*

134 Cong.Rec. § 17365 (daily ed. Nov. 10, 1988) (emphasis added).

The court's reading of the legislative history is bolstered by the sweeping changes made by the 1988 amendments, enacted under the short title of the "Money Laundering Prosecution Improvements Act." When first enacted in 1986, § 981 only authorized the forfeiture of the *gross receipts* a person obtained as a violation of the referenced substantive money laundering prohibitions. *See* 18 U.S.C.A. § 981 (Historical and Statutory Notes). "The term gross receipts meant profits or commissions earned from the money laundering activity, *not* the corpus of the money laundered." Smith, 1 *Prosecution and Defense of Forfeiture Cases* ¶ 5.01 n. 17 (1991). Therefore, the 1988 amendments reflect a clear congressional intent to expand the scope of this forfeiture provision. Caution is always warranted in construing a statute based on a single reference to a word such as "facilitate" in the legislative history. However, the court's interpretation in *$477,048* accords with the intent of the 1988 amendments.

feiture under § 981, not just the proceeds of the initial fraudulent activity. *Id.* at 84. The court found that § 981 implicitly authorized forfeiture under a facilitation theory, reasoning that "[c]riminal activity such as money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme. It is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue." *Id.* at 84–85.

■ The foregoing statutory construction is based on a sound understanding of the crime that Congress sought to deter by enacting § 981. "Innocent" funds are typically a prerequisite to the successful completion of money laundering, the essence of which is the purposeful mixture of tainted money with funds otherwise above suspicion. The more innocent the funds appear to be, the more difficult the crime becomes to detect. Therefore, funds are not immune from forfeiture solely because they are derived from legitimate sources; if such funds are used to effectuate money laundering, they are forfeitable under § 981, just as an otherwise legitimate dwelling would be under § 881 if used for drug-related activity.

## D. APPLICATION TO THIS CASE

The Court now turns to the sufficiency of the complaint in this case under the Supplemental Rules and § 981. The Court will deny the motions to dismiss as to the Direct Accounts, but grant the motions as to the Indirect Accounts.

### 1. *Direct Recipient Accounts*

■ This Court's construction of § 981 simplifies the pleading requirements as to the whole balance of the funds contained in the direct recipient accounts. The government need only plead with particularity that the initial funds negotiated into these accounts were either "involved in" or "traceable to" the crime of money laundering. If the government meets this burden, a reasonable belief that the remainder of the accounts is subject to forfeiture is created by operation of § 981 facilitation theory. Stated differently, nothing further

need be alleged against the balance of the account. The focus is solely on the alleged taint of the funds deposited.

The Court finds that the Complaint against the direct recipient accounts is adequate under the Supplemental Rules. In this case, Zapata was arrested after he attempted to assault a U.S. Customs Special Agent with a machine gun. At the time of his arrest, he possessed a handwritten list of bank accounts into which he had deposited approximately one million dollars in money orders. Several money order receipts have been traced to the Florida direct recipient accounts, indicating that the money orders were sent to Florida and then negotiated into the defendant accounts herein. Taking these allegations as true, as the Court must, the Complaint alleges sufficient facts to give rise to a reasonable belief that the government can establish probable cause at trial as to forfeiture of the money order amounts.

The complaint therefore comports with the requirements of Supplemental Rule E(2) with regard to the whole of the direct recipient accounts.

### 2. *Indirect Recipient Accounts*

■ The Complaint alleges that checks written against some of the direct recipient accounts were signed by the accountholder in blank, and transported to unknown individuals in Medellin, Colombia and Caracas, Venezuela. *Id.* at ¶ 10. Certain checks were subsequently made out to various indirect accountholder payees, and then deposited into the Florida accounts at issue. *Id.*

Under the foregoing construction of § 981, a syllogism can be created that would subject the whole of the indirect accounts to forfeiture. First, as noted above, the entire balance of the direct accounts, is allegedly property "involved in" the crime of money laundering. Second, any check written on the direct accounts is property "traceable to" property "involved in" money laundering. Therefore, the tainted checks from the direct accounts deposited in the Florida indirect accounts would subject the balance of the indirect

accounts to forfeiture. The logical import is that no separate showing of "taint" would be required to plead a case against the indirect defendant accounts. Like a contagious disease, each direct account could contaminate any account that had dealings with it. The indirect accounts could then conceivably pass on the infection to other accounts, and so forth *ad infinitum.* The outer limits of this theory would be bounded only by Plaintiff's imagination.

This Court rejects such a theory. The government's argument here would stretch facilitation theory—itself something of a bootstrap—to the breaking point. As the account in question becomes more distant from the initial illegal transaction, so too does probable cause to forfeit become more attenuated. This Court holds that the government must allege facts other than a mere tracing of checks written against a suspect account. Under the Supplemental Rules, therefore, additional facts that give rise to the requisite "reasonable belief" that that there is a "substantial connection" to money laundering must be plead with particularity.[11] A contrary rule would yield untenable results.[12]

The government here fails to allege such additional facts. There has been no allegation that the indirect accounts were used for money laundering. By contrast, there was no question that the accounts in both *$477,048* and *Certain Funds on Deposit* had been used for money laundering. Indeed, in the former case, the government showed that $2.5 million of tainted money had been laundered through the account although only one-fifth of that amount was seized. *See $477,048,* 754 F.Supp. at 1476. In *Certain Funds on Deposit,* the government alleged that the claimants themselves transferred the tainted funds into the accounts for purposes of money laundering. *See* 769 F.Supp. at 82. Without the benefit of the syllogism urged by the government, the Complaint does no more than detail transfers by check of funds from certain accounts to others, and states that the matter has been investigated by Customs agents and forensic accountants.[13] The allegations would then closely resemble the § 881 complaint dismissed as insufficient by the Eleventh Circuit in *$38,000,* 816 F.2d

11. This holding does not mean that money launderers may insulate themselves from the forfeiture laws by adding more layers to their financial network. The Court simply holds that the government must provide some reasonable basis to conclude that probable cause can be shown *as to each layer* at trial, without sole reliance on the fact of transfer from one account to another.

12. At oral argument on the instant motions, the Court discussed with counsel the logical conclusion of the government's argument by use of a hypothetical example. If a direct accountholder were to write a check to pay bills from Florida Power & Light, or the University of Florida, or made unsolicited donations to the officers of the Miami police force, each of these "claimants'" accounts would be subject to arrest and forfeiture. The government cited as safeguards against this result (1) plaintiff's discretion in bringing suit and (2) the innocent owner defense.

These limitations alone are inadequate. The Supplemental Rules guarantee protection above and beyond plaintiff's good judgment, however well intentioned it may be.

13. The only other relevant allegation is the transfer of some checks written in blank against the direct accounts, transported to Venezuela or Colombia, and deposited into the indirect accounts. This allegation is entirely general; it does not specify the individual indirect accounts which received such checks. Thus, the Complaint fails to link these checks to specific indirect accounts, a fatal defect under the explicit particularity requirement and intent of Supplemental Rule E(2).

The Complaint states that the indirect accounts were identified after an investigation by Customs Agents and "forensic accountants." This allegation must be supported with specific facts in order to sustain a reasonable belief that the accounts are subject to forfeiture. In this case, the Verification by Customs Service Special Agent Rose McNamara in its entirety states: "Pursuant to Title 28 United States Code Section 1746, I declare under penalty of perjury, that I, Rose McNamara, of the U.S. Customs Service, have read the foregoing Complaint for Forfeiture and state that the contents are true to the best of my knowledge and belief." Affidavits of law enforcement officials investigating the underlying criminal activity may be incorporated to support allegations in complaints for forfeiture. *See United States v. Eighty–Eight (88) Designated Accounts,* 740 F.Supp. 842, 847 (S.D.Fla. 1990). However, in this case, the McNamara Affidavit is merely conclusory. No specific supporting facts are set out therein.

at 1548 (conclusory allegations that merely tracked statutory language held inadequate as "completely devoid of factual support" and unsupported by "even a whiff of evidence").

The Complaint will therefore be dismissed as to the entire balance of all of the indirect accounts; the government will have leave to amend the complaint, *see Four Parcels*, 941 F.2d at 1434; *$38,000*, 816 F.2d at 1548, to allege additional facts against the defendant funds that would give rise to a reasonable belief that they are subject to forfeiture.

### III.  MISJOINDER

■ The Court raises the following matter *sua sponte*. The government has joined thirty-one accounts by this action. Federal Rule of Civil Procedure 20(a) provides in relevant part:

All persons (and any ... property subject to admiralty process in rem) may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

These actions should have been filed separately. If the actions involved a common question of law or fact, *see Mosley v. General Motors Corp.*, 497 F.2d 1330, 1333–34 (8th Cir.1974), they could have been consolidated for joint hearing on such common issues. *See* Fed.R.Civ.P. 42(a); *Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492 (11th Cir.1985). The suits would still have retained their separate identities, *see McKenzie v. United States*, 678 F.2d 571 (5th Cir.1982), but those issues common to all could have been resolved by a single division. After disposition of the common issues, the actions would then proceed to trial as the distinct and separate cases they in fact are.

In this unified case, once the Court has ruled on the instant motions to dismiss, issues necessarily particular to each claimant and account will either predominate over or entirely supplant any remaining common questions. Defendants' continuing presence in one action thus constitutes misjoinder under Fed.R.Civ.P. 21. At trial, the government must show probable cause to forfeit each account, and many claimants will invoke the innocent owner defense set out in § 981(b). Proof of these matters is specific to each individual case. A resolution of a unified case on the merits, involving some thirty-one Claimants, each defending on the basis of facts relevant only to their own property, would be unwieldly and unnecessarily complex. Sound judicial administration compels the division of this single suit into separate cases. This case, 91–1018–CIV–KING, shall proceed solely against the direct recipient account maintained by Elnore Resources, with a style so reflecting. All other causes of action for forfeiture the government wishes to bring against any other accounts involved herein shall be brought in separate, individual complaints.

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that the Motions to Dismiss of the Claimants to the DIRECT RECIPIENT ACCOUNTS be, and the same hereby are, DENIED, *provided* however that consistent with Section III of this Order, each of these cases is DISMISSED without prejudice to refile as separate actions, and further *provided* that the case 91–1018–CIV–KING shall proceed solely against the direct recipient account maintained by Elnore Resources, with a style so reflecting. The stay of discovery relating to these accounts is hereby DISSOLVED. It is further

ORDERED and ADJUDGED that the Motions to Dismiss of the Claimants to the INDIRECT RECIPIENT ACCOUNTS be, and the same hereby are, GRANTED. Discovery as to each of these accounts is STAYED until a responsive pleading is filed by the Claimant. It is further

ORDERED and ADJUDGED that this Court's Order dated June 26, 1991 denying the Motion to Dismiss of Claimant Cecilia

Patricia Luna be, and the same hereby is, VACATED. It is further

ORDERED and ADJUDGED that the government shall REFILE separate Verified Complaints for each account or accounts owned by each Claimant within thirty (30) days of the date of this Order, except that the case 91–1018–CIV–KING shall proceed solely against the direct recipient account maintained by Elnore Resources, with a style so reflecting. It is further

ORDERED and ADJUDGED that all other pending motions are DENIED without prejudice to renew them in the refiled cases.

DONE and ORDERED in chambers at the United States District Courthouse, Federal Courthouse Square, Miami, Florida, this 21st day of February, 1992.